Submitted on the record December 18, 1981,
accused suspended for 30 days April 6, 1982

In re Complaint as to the Conduct of

## RONALD J. LOEW,
*Accused.*

(OSB No. 80-26, SC 28180)

642 P2d 1171

PER CURIAM.

Peterson, J., filed a concurring opinion.

## PER CURIAM.

This is a disciplinary proceeding brought by the Oregon State Bar. The accused is charged with violation of the following Disciplinary Rules of the Code of Professional Responsibility:

"(1) DR 1-102 Misconduct

(A) A lawyer shall not:
    * * * * *

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(2) DR 6-101 Failing to Act Competently

(A) A lawyer shall not:
    * * * * *

(3) Neglect a legal matter entrusted to him.

"(3) DR 7-101 Representing a Client Zealously

(A) A lawyer shall not intentionally:
    * * * * *

(2) fail to carry out a contract of employment entered into with a client for professional services * * *."

The Trial Board found the accused not guilty of the first charge (Misconduct) and guilty of the second two charges (Failing to Act Competently and Representing a Client Zealously). The Disciplinary Review Board found the accused guilty of all three charges. We decide the facts upon the record made by the Trial Board.

The charges flow from the accused's representation of a client in a licensing proceeding before the National Transportation Safety Board (NTSB). The client retained the accused to represent him in an administrative hearing to challenge the denial of an upgrading of his pilot's license. The accused performed that responsibility satisfactorily, but the administrative law judge ruled against the client. The client then retained the accused to handle an appeal of the administrative law judge's ruling to the NTSB.

The accused filed a notice of appeal dated June 18, 1979. He obtained three extensions of time for the filing of his brief on appeal, the last being to October 1, 1979. The accused never filed the brief. In December, 1979, the NTSB

dismissed the appeal because no brief had been filed. Counsel for the Federal Aviation Administration, the adverse party in the proceeding, assured accused she would not object to reopening of the appeal, but no petition for reopening the appeal was filed.

From the commencement of the appeal in June, 1979, until August, 1980, when the client terminated accused's representation, the client made about 40 telephone calls to the accused to determine whether the brief had been filed and to urge the accused to do so. Most of the calls reached an answering recorder or the accused's secretary. On each occasion, the client left a request that the accused return the call. On no occasion did the accused do so.

The client kept notes of the date and content of each telephone conversation. We need not recite each conversation, but the pattern was similar. The accused consistently said that he was working on the brief, that it will be ready and filed soon ("tomorrow," "Thursday," "weekend," etc.) and that he would send the client a copy. On one occasion, October 24 and 25, the accused told the client that he had finished the brief and had filed it. In his only written reply to the client, the accused wrote on November 27, 1979:

> "I will complete our appeal by the end of this week and send it to Washington with a copy to you which you should receive by Monday."

In February, 1980, the client hired another lawyer who pressed the accused to petition to reopen the appeal and to file the brief. The accused assured the second lawyer that he would do so immediately.

In April, 1980, the Assistant General Counsel of the Oregon State Bar inquired of the accused regarding the client's complaint. The accused wrote back that "I am therefore preparing a petition to the Board to request that it accept the appeal brief."

In July, 1980, this matter was before the Multnomah County Professional Responsibility Committee.

The accused told an investigating member of that committee that he would promptly file a motion to reinstate the appeal and the brief.[1]

In August, 1980, the client sent a registered letter to the accused terminating the relationship and requesting return of the file. The letter was returned unclaimed. The client sent it once more and receipt was acknowledged by the accused's wife who acted as his secretary. The request was not complied with.

We find, and the accused does not contest, that he neglected a legal matter entrusted to him in violation of DR 6-101(A)(3).

We also find that the accused's conduct constituted misrepresentation in violation of DR 1-102(A)(4). His repeated representations to his client and to others that he was working on the brief, that he would promptly file it and, on October 25 that he had filed it, and also his representations that he would file a petition to reopen the appeal, accurately represented neither his present conduct nor his intentions as to conduct in the near future. They were intended to mislead the client and the representatives of the Bar so they would not take action which would be appropriate if they knew that the accused was not working on the brief and would not file it and the petition in the near future.

We also find that the accused violated DR 7-101(A)(2) by intentionally failing to carry out a contract of employment entered into with a client for professional services. The accused disputes only whether his failure to carry out the contract was intentional. He testified that at all times he intended to serve the client, but was unable to bring himself to actually do the work. The Bar counters that he intentionally did the acts which constituted a failure to carry out the contract and we agree. At some point, the accused's continuing act of omission, extending

---

[1] The lawyer testified that the accused told him he had actually filed the petition and the accused denied it. The lawyer was certain in his memory. The accused was adamant that he said only that he was working on it and would file it. We cannot say that the evidence is clearly and convincingly persuasive that there was not a miscommunication in the course of that conversation rather than an intentional falsehood by the accused.

over a year, could no longer be characterized as procrastination. His failure to act despite the urgings of the client and the client's second lawyer, and despite his own knowledge of his professional duty to act, must be characterized as intentional conduct.

As intolerable as the accused's conduct was, the purpose of this proceeding is not to punish him but to restrict his license to practice law to the extent necessary for the protection of the public from future unethical conduct. To that end, we next inquire into the background of the accused and his ethical violations.

The conduct described above is uncharacteristic of the accused's practice. His academic performance in law and international relations was impressive. He spent the first 12 years of his practice in governmental employment of high responsibility, handling domestic and international matters of air travel and other transportation. In 1971, he returned to Oregon and entered private practice. We are unaware of any prior blemish on his record.

In January, 1980, the accused, acting out of concern for the manner in which he handled this client's affairs, sought psychiatric aid. His psychiatrist testified at the hearing that the accused was suffering from "burnt out syndrome," common to professionals. A common pattern of the syndrome is that a professional person feels obliged to help each person who seeks his help, takes on more work than he can handle, including work he finds unpleasant, and evades such work by procrastination and self-denial.[2] The psychiatrist also testified that the accused had gained understanding of his problem and was dealing with it constructively. He felt that the accused was more than halfway down the "road to recovery."

---

[2] The psychiatrist testified in response to the accused's questioning:

"A number of things occur when somebody has reached this so call burn out point. They feel fatigue all the time, they have difficulty sleeping, they feel drained, may have an array of physical ailments which occur which are quite real, maybe hospitalized as you were, have memory lapses, impaired concentration, frequently miss deadlines, backlog of work, financial problems, begin to view patients or clients or whatever people you're working with, or you begin to view your work as the enemy and 'Oh, my God, here comes another patient, another client', and so on. Rather than someone who is a team member, it's an opponent.

We conclude that the conduct of the accused was an isolated event caused by emotional difficulties with which he is now dealing effectively. Disbarment is not required for the protection of the public. On the other hand, his conduct is serious enough to warrant suspension. We therefore adopt the recommendation of the Disciplinary Review Board that the accused be suspended. We also conclude that he should repay to the client $500, his retainer for the appeal to the NTSB. We therefore order that the accused be suspended from the practice of law for 30 days from the date this decision becomes final and thereafter until such time as the accused presents satisfactory evidence to this court that he has repaid $500 to his former client and a written statement by his psychiatrist that the accused is sufficiently free of emotional difficulties to competently practice law.

---

"And they represent more trouble to you, you begin to have marital and family problems and a wide variety of chaotic situations begin to develop. So that any situation which presents a challenge that has to be dealt with in a special attentive emotional manner can be viewed as something overwhelming. For example, [the client in this case] who really irritated you. Really irritated you. Would be somebody you'd have to sit down and deal with directly and say, '[Client], I don't like this, I don't think you're behaving appropriately, I don't want to take your case.' That's tough for you to do. You have no good history of doing that very well. So that takes a lot of energy and when you're at the point of burnt out, that kind of behavior is overwhelming and is avoided. So I don't feel your treatment of him was particularly unusual."

\* \* \* \* \*

"[The client] was very annoying to you because of his behavior, his frequent phone calls, his pushing you and essentially sounding as though he was bothering you quite a bit, calling you at home, calling you many times a day and so on.

"And since you've never been very effective at setting limits on who you take and who you say no to and who you tell you're mad at, you had some difficulty telling this man that his behavior was making it difficult for you to work for him and that you, in fact, didn't want to work for him anymore. And instead of doing that, you used a fairly popular defense of procrastination and putting it off, sliding it by and all of it not a conscious effort to bury this guy, but more as a denial of your own hostile feelings about him."

Incidentally, the accused testified that he did not find the client's behavior excessively aggressive or otherwise improper in any way. The references to the client in the psychiatrist's testimony relate more to the emotional effect on the accused than to the actual nature of the client's behavior.

Accused suspended for 30 days. Judgment to Oregon State Bar for costs.

**PETERSON, J.,** concurring.

The court's opinion should be required reading for every lawyer, for almost every practicing lawyer becomes involved in situations which create pressures and stresses akin to those which are present in this case.

The scenario is not unusual. A strong-willed, competent client (in this case, a retired USAF Lieutenant Colonel). An intelligent, successful attorney, highly trained in the subject matter involved in the matter at hand. An unsuccessful result. Inability of the lawyer to bring himself to do comparatively simple work which he was trained to do and was capable of doing, and which had to be done. And finally, inability of the lawyer to ask for help.

Almost every lawyer—almost every person, for that matter—encounters similar situations at one time or another. The nonlawyer may lose a job. The lawyer may lose a license to practice law. How can the lawyer recognize the danger signals? What should the lawyer do?

If a lawyer is in a group practice, opportunity exists for discussing the problem with associates.[1] The sole practitioner sometimes has no ear to bend, no ready assistance and no sympathetic counsel. Of course, the file can be referred to another lawyer. But this case proves that that alternative, for inexplicable reasons, is not always followed. Often it is not.

The lawyer-client relationship is a complex one. Lawyers are trained to exclude emotional considerations from their analysis of most cases. Yet relations between a lawyer and a client involve the same type of emotional considerations as in many other interpersonal relationships and require highly developed communications skills.

---

[1] Ronald E. Mallen, in "Legal Malpractice," § 14, 32 (1977) points out:

"The interaction between attorneys within a firm can be an important factor in preventing malpractice. Without suggesting a catharsis, it can be helpful for attorneys to share with each other the types of errors they have made, the reasons the errors occurred, and the solutions (if any) which were found. * * *"

Lawyers must be alert to the emotions involved in practicing law. In a provocative article, Andrew Watson states:

"* * * While it is true that emotions can grossly disrupt rationality, it is also a fundamental fact of psychological life that to ignore the existence of emotions is itself irrational. It is crucial that professionals who deal with people and their passions be able to react properly to such passions without creating behavior inconsistent with professionally accepted aims and actions. To ignore the enemy is not to defeat him." A. Watson, *Lawyers and Professionalism: A Further Psychiatric Perspective on Legal Education,* 8 U Mich J L Ref 248, 252 (1975).

Unfortunately, few lawyers are trained to detect the existence of a deteriorating client relationship or to discuss the causes of the problem.

"Like law students, until very recently no medical student was told how important his interaction with a patient could be or how to communicate more effectively with the patient. Most still are not told. Senator Ribicoff recounts asking a professor of internal medicine what in his view was the single greatest flaw in American medical education. He replied, 'We never teach our students the most important part of medicine. We never teach them what it's like to be a patient. So they go out into practice not knowing what patients really need and why they are so upset with us.' Medical students, he said, rarely learn what medicine looks like from the bottom up because their professors make little effort to leave the ivory tower. The same thing is substantially true of most law students and professors." A. Smith and P. Nester, *Lawyers, Clients, and Communication Skill,* BYU L Rev 275, 325 (1977).

Smith and Nester claim that the best place to develop lawyer-client communication skills is in the law school. *Id.* at 324. Mr. Watson echoes that view:

"Because law students do not habitually conceptualize their future roles as lawyer-professionals, those who teach them how to behave as lawyers become extremely important in the ultimate shaping process. It thus borders on irresponsibility to leave the professionalizing process to the random adventitious experiences of post-law school encounters. It is critical then that legal educators avoid reinforcement of inappropriate lawyer behavior and avidly grasp every opportunity to reinforce positively those behaviors which are vital to effective and appropriate professional practice. For example, a law teacher who

discourages, makes light of, or ignores the multitude of practical problems about law practice that constantly press into a law student's consciousness only reinforces his belief that issues about lawyer-client relationships are unimportant and of secondary consequence. If the faculty attitude toward professionalism were to be rejected by students, so, too, might others of the precepts they teach be seriously challenged. Consequently, ideas about professional behavior gathered from practicing lawyers will be eagerly grasped and emulated by the student, even when such practices border on unethical behavior. Because of this intensely felt psychological need for appropriate models, all learning experiences, both in and out of law school, will vitally affect the ultimate behavior and character-shaping of every law student and young lawyer." A. Watson, *Lawyers and Professionalism: A Further Psychiatric Perspective on Legal Education,* 8 U Mich J L Ref 248, 250-251 (1975). (Footnotes omitted.)

Over the years I have seen a host of intelligent, capable lawyers get into trouble because of their inability to recognize and resolve problems such as faced Loew in this case. I am not trained or skilled in psychological matters. The psychiatrist who testified for Mr. Loew in this case stated, "* * * [O]ne of the behavior skills that [one in Loew's position lacks] is the ability to go to somebody or anyone and ask for help, seek support when you're feeling like you're getting a little bit overwhelmed. * * *" One thing seems to be clear: The lawyer in that situation often is incapable or unwilling to face the problem (courts rarely say which, usually because the record lacks expert testimony such as we have in this case) and has lost the ability to discuss the problem with anyone, including the client.[2]

---

[2] "Many lawyers and clients are reluctant to engage in mutual discussion about the dynamics of their relationship. This kind of discussion—requiring a skill that many lawyers lack—has been referred to as 'immediacy.' Immediacy as a communicative technique can be useful to both lawyer and client.

"A lawyer may find an immediacy discussion useful when he senses that unmentioned thoughts and feelings of the client are affecting the client's behavior and getting in the way of success. Such thoughts and feelings may simply reflect differences of style between the lawyer and the client, or they can result from mistrust. Both lawyer and client may experience interpersonal difficulties and immediacy may be useful in reducing these problems." A. Smith and P. Nester, *Lawyers, Clients, and Communication Skill,* BYU L Rev 275, 318-319 (1977). (Footnote omitted.)

*See also,* C. Kelso, *Conflict, Emotion, and Legal Ethics,* 10 Pac L J 69 (1979).

The problem is complex. The decision as to the appropriate sanction in such cases is more difficult because the lawyer's motivation is different from that of the lawyer who steals or lies to obtain advantage. But the need for protection of the public and integrity in the administration of justice is as great as that which exists in the case of dishonest lawyers.