## IN THE MATTER OF THOMAS J. BARRY, AN ATTORNEY-AT-LAW.

Argued January 26, 1982—Decided July 28, 1982.

*Robyn M. Hill* argued the cause for complainant, Disciplinary Review Board (*Colette A. Coolbaugh*, Secretary, attorney).

*Saverio R. Principato* argued the cause for respondent.

PER CURIAM.

These disciplinary proceedings commenced with the filing of a complaint with the District IV Ethics Committee (local committee) by the law firm with which respondent, Thomas Barry, was associated. The firm charged Barry with a series of what can be described only as extraordinary and bizarre ethical transgressions that occurred between the latter part of 1974 and June 1979. One of the unusual aspects of the matter is that respondent not only admitted, in his answering pleading, the nineteen separate instances of misconduct set forth in the complaint, but in the interests of full disclosure acquainted the local committee with two additional transactions that he believed might involve ethical violations.

Respondent's defense was that he did not intentionally violate the Disciplinary Rules "because, as subsequent psychiatric evaluations confirmed, [his] actions were the result of psychic conflicts rather than a reflection of [his] intent to defraud either [his] partners or [his] clients." When the misconduct came to light in June 1979, Barry voluntarily withdrew from the practice of law and promptly obtained psychiatric aid. About nine months thereafter he resumed practice as an associate in anoth-

er lawyer's office and continued in therapy until August 1980, when he was discharged from further regular treatment. He continues to practice in the association he formed in April 1980.

After a hearing the local committee filed a presentment charging respondent with violations of numerous ethical rules. The DRB conducted its own hearing, on the completion of which it recommended a private reprimand. We have made an independent review of all the evidence and have concluded that a suspension is warranted.

## I

After a period of clerkship while he was attending law school, respondent became employed with a Woodbury law office in August 1974. He had taken the bar examination but was not sworn in as an attorney until December 1974. Even before being admitted respondent was given responsibility for some files, and ultimately the number of cases he was charged with handling reached about 200.

One of the first matters entrusted to respondent—and one of the first with which he had difficulty—was given to him by a principal in the firm about three or four weeks before his admission date. It involved a claim of A.C.M. Realty Co., Inc. for about $18,000 in real estate commissions. Between 1974 and 1979 Barry told the client's principal of numerous trial listings and ongoing negotiations, and twice had the client travel to the courthouse. In truth no suit had been started and there had never been any negotiations.

Respondent's fabrications in the A.C.M. matter did not come to light until June 1979. The circumstances of that revelation are perhaps best appreciated by reference to the testimony of one of the law firm's principals before the local committee:

One day * * * [the client] came storming in the office and demanded to see me and indicated to me that he had been sitting at court several times. On one occasion is called back from a vacation that he had been on because the case was listed for trial and he didn't understand why it was listed so many times and why it took so long. At this point I think it was about four years or so that the case had allegedly been in process. Maybe longer.

At this point I asked Tom [Barry] to get the file and come in. He brought in a file jacket with, I believe, was the original letter that I had gotten in the file and turned it over to Tom and I said, "Bring me the whole file." I looked at it and saw the original letter from when I turned it over to him and asked him for the balance of the file and he said, "That's it."

He didn't do anything on the file. I gulped, like I am gulping now, and asked if he had filed the complaint and he indicated that he hadn't, and at that point I called my partners * * * to come down to the office and indicated, "I think we have a problem."

Indeed they did. As the tangled skein unravelled, it appeared that at least eighteen additional files that had been entrusted to respondent were in disastrous shape. Of these, eight were characterized by variations on the A.C.M., Inc. theme that is, Barry told the clients that their cases were in various stages of progress when in fact he had taken no steps to advance the clients' interests. In another eight cases respondent had permitted the statute of limitations to run against the clients. In two other cases Barry had borrowed money from the clients and had performed legal services for them as an offset against the loan without the knowledge of any member of the firm, thereby violating his financial arrangement with the office, which entitled him to keep a percentage of the fees he generated with the balance going to the firm. Two additional instances of misconduct, voluntarily disclosed by respondent, involved complicated schemes by which he hid the fact that he had not attended to the clients' affairs and had even advanced his personal funds—and, in one instance, cosigned a $7000 note—to placate the clients.

The response of the law firm to this dilemma was immediate and, as far as the clients were concerned, effective. The principals called in every client involved in respondent's files and explained the true status of his case. They structured a "crash program" to bring the mishandled files to a rapid conclusion, in many instances by instructing the clients to seek independent counsel and then settling the cases out of their own pockets. The result was that no client sustained any pecuniary loss. In addition, the firm's principals persuaded respondent to undergo psychiatric therapy with Dr. Scott Sibert.

As for Barry, in addition to seeking psychiatric assistance he immediately withdrew from the practice of law, as we have indicated above. To his parents he made a clean breast of the whole sorry affair, and his father and brother helped him devise a plan to relieve his mountainous indebtedness, since his assets, including the value of his pension and profit-sharing plan and receivables from his share of legal fees, had been depleted by the various claims. He cooperated immediately and completely with the local committee. He did not return to the practice until he and his physician were confident he could cope with the pressures of practice. The burden of his work in his new association is substantially lighter than that which he was attempting to sustain during the 1974–1979 period, and he appears to be bearing it successfully. There is no allegation of misappropriation of funds.

The presentment issued by the local committee concluded that respondent had violated *DR* 1–102(A)(4) (conduct involving dishonesty, fraud, deceit and misrepresentation); *DR* 1–102(A)(6) (conduct adversely reflecting on fitness to practice law); *DR* 6–101(A)(1) and (2) (gross negligence and exhibiting a pattern of negligence); *DR* 7–101(A)(1), (2) and (3) (failure to seek lawful objectives of client, failure to carry out contracts of employment and prejudice to client's case); and *DR* 7–102(A)(5) (knowingly making false statements of law and fact to clients). At the same time the local committee emphasized that during the period of 1974 through 1979 the respondent was suffering from psychic conflicts, that he had anxiety related to his work setting, and that his thinking and reasoning were unrealistic. We conclude, as did the committee, that respondent had no intent to defraud either the clients or his employers.

## II

It is apparent that the respondent was a young attorney who was unable to cope with the demands of an active law practice. He recognized almost immediately the effect this shortcoming

had on his professional obligations, at least in respect of one of the first matters entrusted to him, but failed to seek assistance from his employers or anyone else. Once he fell behind on a file, it was easier to put the problem out of mind than to confront it.

We are not unmindful of nor insensitive to the stressful work conditions in which respondent found himself. The record once again raises the problem of what can happen to younger lawyers in thriving firms who are given important responsibilities in recognition of their demonstrated abilities. Sometimes the demands of those responsibilities are beyond the lawyer's capacity. Natural talent is no substitute for years of practice and the crucible of experience. Respondent does not seek to place on his employers the blame for his quandary, nor would this record satisfy us that it should be laid there. But the problem remains, and we trust that the bar shares our concern that newly admitted attorneys in a law firm should be given guidance and supervision by their senior colleagues. Those practicing alone are cautioned not to yield to the temptation of getting in over their heads.

Neither are we indifferent to respondent's marital difficulties, culminating in a divorce in November 1974 and doubtless contributing to his aberrant behavior. We note too that since returning to the active practice of law in April 1980, respondent has not experienced any recurrence of his psychiatric problems. Dr. Sibert sees no present need for therapy and suggests that should problems arise in the future, they could be resolved through continuing or additional therapy.

### III

With all that said, the plain fact of the matter is that it is difficult to imagine more serious instances of delinquency than those of which respondent is guilty. His transgressions reflect on the competency and integrity of the entire bar. Aside from the peril in which he placed the interests of the firm's clients, when respondent performed legal work for his personal clients

from whom he had borrowed money and then offset his legal services against his indebtedness to those clients, he in effect took the money of his law firm. He admits that the money he gave to one client, in an effort to stave off the inevitable discovery of his mishandling of the client's affairs, was "actually drawn as fees and cashed and paid * * * out of my own monies." That translates into converting his employer's funds to his own use.

Ordinarily these infractions would call for severe disciplinary measures. See *In re Stern*, 81 *N.J.* 297 (1979). However, there are substantial mitigating circumstances present. When Barry's transgressions finally surfaced, he gave his full cooperation to everyone concerned with setting matters aright. He divorced himself from the practice of law for nine months and submitted himself to psychiatric therapy. His efforts at rehabilitation were resolute and apparently successful. We therefore view the appropriate discipline as suspension from the practice of law for three months and until further order of the Court. In addition, respondent is to reimburse the Division of Ethics and Professional Services for the costs of stenographic transcripts.

So ordered.

CLIFFORD, J., dissenting.

The public needs no protection from the respondent. In no sense is he a menace. His heroic efforts to rehabilitate himself have been successful. His psychiatrist is confident that Barry can now withstand the burdens of a law practice, and he reports that respondent has the general character traits of conscientiousness, sense of fairness, desire to do a good job, and a high level of responsibility.

The conclusion is inescapable that a considerable measure of blame for respondent's predicament must fall on the shoulders of the principals in the law firm that employed him, even though he does not seek to place it there. In its presentment the local committee emphasized that respondent "was given numerous

files to handle with little or no guidance * * *." It is simply inexcusable to impose on a fledgling lawyer the total responsibility for clients' affairs without some regular supervision. It is not enough that the principals be available if needed. This sorry episode points up the need for a systematic, organized routine for periodic review of a newly admitted attorney's files. The "sink or swim" approach is ill-suited to a high volume professional operation.

In this case the main result of the Court's suspending respondent from the practice of law, even for the brief period of three months, will be to jeopardize a promising career and undermine this young lawyer's initiative. He needs no suspension to remind him of the anguish his past misdeeds have brought to so many people—clients, employer, family, friends—particularly inasmuch as he is now saddled with an enormous indebtedness as a result thereof. Nor will the honor of the profession and the integrity of the bar be sullied if we treat these ethical violations with forbearance. This tragic episode, nonvolitional in nature, unmarked by greed or venality, demands no more than a public reprimand. I so vote.

*For suspension*—Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Dissenting*—Justice CLIFFORD—1.

### ORDER

It is ORDERED that THOMAS J. BARRY of Woodbury be suspended from the practice of law for three months and until the further order of this Court, effective August 16, 1982; and it is further

ORDERED that THOMAS J. BARRY be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that THOMAS J. BARRY reimburse the Administrative Office of the Courts for the cost of all stenographic transcripts in connection with this matter; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.