STATE of Oklahoma ex rel. OKLA-
HOMA BAR ASSOCIATION,
Complainant,

v.

Chris E. COLSTON, Respondent.

SCBD No. 3487.

Supreme Court of Oklahoma.

May 9, 1989.

Rehearing Denied July 6, 1989.

Alan B. Foster, Asst. Gen. Counsel, Okla-
homa Bar Ass'n, Oklahoma City, for com-
plainant.

Paul M. Vassar, Vassar and Vassar,
Chandler, for respondent.

Cleta Deatherage Mitchell, Derryberry,
Quigley, Parrish & Gooding, Oklahoma
City, for amicus curiae, Theresa R. Wilson.

OPALA, Vice Chief Justice.

In this proceeding against a lawyer for
imposition of professional discipline the is-
sues are: 1) Can the respondent's mental
or emotional condition be invoked as a ve-
hicle for deferment of imposition of disci-
pline? and 2) If not, then what is the proper
measure of discipline to be imposed upon
respondent for his misconduct? We an-
swer the first question in the negative and,
responding to the second, we conclude that
disbarment is the only appropriate sanc-
tion.

Chris E. Colston [Colston], a licensed lawyer, was charged with five counts of professional misconduct for neglect, misrepresentation, fraud and deceit. The last two of the counts deal with forgery. The trial panel of the Professional Responsibility Tribunal [PRT] found Colston guilty on all five counts and recommended that imposition of discipline be deferred for a period of two years, provided Colston complies with specified requirements (limit his practice to a stated level of business and submit himself to weekly psychological counseling). The Bar's prosecutor presses for a more serious sanction, while Colston urges that both suspension and disbarment would be too severe. Respondent submits the PRT's recommendation is appropriate and should be upheld.

## COUNT 1

In January 1984 Theresa Leishman [now Wilson] retained Colston to foreclose her lien in certain Oklahoma County real property and to recover on a promissory note. She paid him in July 1984 a retainer of $200.00. Colston did not institute proceedings until May 13, 1985. Although he did nothing further in the case, he made numerous misrepresentations to Wilson about its status (i.e., the defendants had been served and were in various stages of bankruptcy, a foreclosure decree had been obtained and a sheriff's sale taken place).

Although Colston denied he ever received the fee from Wilson, the Bar Association's [Bar's] exhibit 2a, a check from her to Colston, shows she did pay him $200.00 on July 31, 1984. At the disciplinary hearing Colston admitted he told his client the defendants were in bankruptcy when in truth they were not. He did not remember the other misrepresentations but said he could have made them.[1]

## COUNT 2

Evelyn Morris [Morris] retained Colston in June 1983 to foreclose her lien in certain Oklahoma County real property. He initiated the proceedings November 4, 1983 and then failed to perform any further work. He made numerous misrepresentations to Morris about the status of her case (i.e., a foreclosure decree had been obtained, a sheriff's sale had taken place and she would be receiving a deed from the sheriff). In December 1986 Colston contacted Morris and offered $5,000.00 to her new counsel as damages for his (Colston's) misconduct in return for a promise that she request the Oklahoma Bar Association in writing not to proceed against him. Colston admitted at the hearing he had made these misrepresentations to Morris and had a phone conversation with her in December 1986, in which they discussed the damages she had suffered from his negligent misrepresentation. He denied attempting to exonerate himself or to limit his liability to Morris.

## COUNT 3

In January 1985 Colston was retained by Phoenix Federal Savings and Loan to foreclose its lien in certain real Oklahoma and Cleveland County properties. He filed *one* petition in May 1985 in Oklahoma County only. No further proceedings took place. Among Colston's numerous misrepresentations to Phoenix about the litigation's status were those that *petitions* had been filed in *both* Oklahoma and Cleveland Counties, judgments had been obtained, sheriff's sales had taken place and deeds secured. The sheriff's deeds Colston later gave Phoenix indicated foreclosure decrees had been obtained and sheriff's sales followed. The deeds Colston procured from

---

1. After the PRT recommended a two-year deferred sanction, Theresa Leishman [Wilson] sought leave to file brief *amicus curiae* in this bar disciplinary case for the purpose of urging a more severe sanction. In her application Wilson states that while Colston admits his negligent conduct as well as misrepresentations, he has denied identical allegations in a civil lawsuit she filed against him and his law partners for the harm inflicted on her. She urges that Col-

ston should not be allowed to admit mistreating her in order to receive this court's "mercy" while at the same time denying identical misconduct to avoid compensating her for his wrongdoing. Although Wilson later advised she had settled her claim against Colston, she continues to urge that the damage suffered by Colston's former clients should not be overlooked when this court considers the appropriate measure of discipline to be imposed.

the sheriffs of the respective counties were unauthorized conveyances induced by his admitted misrepresentation. When Phoenix learned of the deception, Colston was discharged and instructed to withdraw immediately as its counsel. This he failed to do; because, as he said, he believed that Phoenix's new counsel would prepare the necessary withdrawal papers.

### COUNT 4

In December 1986 Colston filed a foreclosure suit in Noble County on behalf of M & I Marshall & Ilsley Bank against Rick Evans. Colston then cut out copies of Rick and Virginia Evans' signatures, taped them in March 1987 to an entry of appearance and disclaimer form, reproduced them and then filed the copies in the case. Judgment was later taken on the strength of these forged signatures. Colston admitted he never spoke with either of the Evans couple concerning the entry of appearance and disclaimer but stated he had "no recollection" of forging their signatures.

### COUNT 5

Colston filed a foreclosure suit in Garfield County in December 1984 on behalf of American Mortgage and Investment Company against Gary Wayne Brothers. In November 1986 Colston cut out copies of Gary and Barbara Brothers' signatures, taped them to an entry of appearance and disclaimer form, recopied them and then filed the forged papers in the case. Using the same method, Colston also affixed the signatures of Ronald and Pamela Freeman to another entry of appearance. Judgments were later taken in reliance on the forged appearances. Colston denied having any memory of either speaking with these parties about signing their entry of appearance or of forging the signatures.

### I

### COLSTON'S RESPONSE

Colston concedes he has violated the Code of Professional Responsibility.[2] In

mitigation of discipline he offers evidence of his mental and emotional state between 1983 and 1987—the period during which his misconduct occurred. During this time Colston was plagued by serious personal problems as well as by a stressful work environment, both of which, he claims, affected him adversely. Colston divorced his first wife in 1983, the marital breakdown allegedly stemming from her change in sexual preferences. In 1985 he married his current wife. She developed severe alcohol problems in September 1986 and was later hospitalized for treatment.

During the period of the charged misconduct Colston's work environment had been very stressful. He handled a vast number of cases. While in the early 1980's he had 40 to 50 active foreclosure files, that number rose steadily until it reached 500 to 600. Later on, his personal case load decreased to about 350 or 400 cases, although he was the supervising lawyer for another 200. Colston was working about 12 to 14 hours a day. It is urged that this heavy workload, coupled with highly traumatic marital experiences, plunged him into severe depression.

Colston left in March 1987 the law firm where he was working and entered private practice in Norman. He has reduced his case load to about 40 or 50 cases at a time, limiting himself to an eight-hour workday. In May 1987 Colston sought psychological counseling services and continues receiving them at present.

### II

### COLSTON'S PSYCHOLOGICAL EVIDENCE

Dr. M., a clinical psychologist, interviewed Colston and gave him a comprehensive evaluation for the purpose of giving testimony at the hearing about Colston's state of mind during the period of his misconduct.[3] The assessment included a bat-

---

**2.** 5 O.S.1981, Ch. 1, App. 3. The Code of Professional Responsibility was superseded by the

Rules of Professional Conduct, effective July 1, 1988, 5 O.S.Supp.1988, Ch. 1, App. 3–A.

**3.** Dr. M. spent with Colston a total of three

tery of psychological tests[4] designed to identify and isolate acute from chronic problems and to detect those on the surface of the personality as distinguished from others that are found at a deeper level. These tests, Dr. M. stated, aid him in reconstructing and presenting evidence of an individual's past state of mind.[5] According to his opinion, during the period of misconduct Colston was in a severe state of depression. He had assumed excessive responsibility for work, because (a) his personality type is very conscientious and sensitive to guilt and (b) he was affected by severe trauma dealt him by his wife's altered sexual orientation. This "workaholic" type of behavior, which manifested itself during the period of misconduct, propelled Colston into willing acceptance of an incredibly heavy case load. The stress he endured during this five-year period was so great that he was unable to discern the real from the unreal; it also explains Colston's poor judgment and his inability to refuse accepting added responsibilities. The inability to say "no", Dr. M. related, is common in this type of personality disorder.

Colston's mental constraints, present at the critical time, provide, in Dr. M's view, the best explanation for his lack of recollection. In Dr. M's opinion, Colston has benefited from the psychological counseling and his prognosis is good.

## III

### VIOLATIONS OF CANONS OF PROFESSIONAL RESPONSIBILITY

■ In lawyer disciplinary proceedings this court does not function as a reviewing tribunal but rather exercises its exclusive *original* jurisdiction. The PRT's findings of fact and conclusions of law are neither binding on this court nor do they carry a presumption of correctness. The ultimate responsibility for administration of professional discipline and for imposition of sanctions rests with this body.[6]

The sufficiency and weight of the evidence adduced in bar cases is accorded *de novo* review.[7] It is the Bar's burden to establish the charges by clear and convincing proof.[8] The case against Colston is

hours during the interview and evaluation process. This period of time was equally divided between conducting the psychological tests (*infra* note 4) and interviewing Colston.

**4.** The battery of tests, given on March 11 and 12, 1988, included the Wechsler Adult Intelligence Scale, the Hand Test, Rorschach Test, the Minnesota Multiphasic Personality Inventory and the Beck Depression Inventory.

**5.** Dr. M. stated that the reconstruction process involves examining past events in a person's life—relative to the present diagnosable disorder—to gain insight into the course of those problems. As different life events become unfolded, which either minimize or increase stress on an individual, an assessment is then made of the skills needed to cope with their stress and the probability when some psychological defenses would begin to crumble.

**6.** *State ex rel., Oklahoma Bar Ass'n v. Samara,* Okl., 725 P.2d 306, 308 [1986]; *State ex rel. Okl. Bar Ass'n v. McNaughton,* Okl., 719 P.2d 1279, 1282 [1986]; *State ex rel. Oklahoma Bar Ass'n v. Braswell,* Okl., 663 P.2d 1228, 1230 [1983]; *State ex rel. Okl. Bar Ass'n v. Raskin,* Okl., 642 P.2d 262, 265–266 [1982]. For the Supreme Court's constitutional authority over the institutionalized state bar, see *Tweedy v. Oklahoma Bar Ass'n,* Okl., 624 P.2d 1049, 1052 [1981]; *In re*

*Integration of State Bar of Oklahoma,* 185 Okl. 505, 95 P.2d 113, 114 [1939].

**7.** Rule 6.15(a), Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, provides:
"The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."
*State ex rel. Okl. Bar Ass'n v. McNaughton, supra* note 6 at 1282. For earlier expressions of the Supreme Court's standards of review in a bar disciplinary proceeding, see *State ex rel. Oklahoma Bar Ass'n v. Raskin, supra* note 6 at 266; *State ex rel. Okl. Bar Ass'n v. Hensley,* Okl., 560 P.2d 567, 568 [1977]; *State ex rel. Oklahoma Bar Association v. Foster,* Okl., 454 P.2d 654, 656 [1969].

**8.** Rule 6.12(c), Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, provides:
"To warrant a finding against the respondent in a contested case, *the charge or charges must be established by clear and convincing evidence* and at least two of the members of the Trial Panel must concur in the findings." [Emphasis added.]
Before the adoption of Rule 6.12(c) February 23, 1981 (effective July 1, 1981), the standard of

undisputed except for those instances where he claims to have no memory of actions charged against him. The record contains more than ample credible proof for PRT'S material findings on the issue of Colston's guilt. It is plain to us that Colston violated Canons 1, 2, 6 and 7 of the Code of Professional Responsibility.[9] He is also guilty of violating Rule 1.3, Rules Governing Disciplinary Proceedings.[10]

### Practice Of Deceit And Neglect Of Client's Legal Affairs

Colston was charged with neglecting his clients' legal affairs, coupled with a pattern of deceitful conduct. Willful failure to perform legal services for which a lawyer has been retained warrants disciplinary action;

persuasian was "preponderance of the evidence." It was formerly prescribed by 5 O.S. 1981, Ch. 1, App. 1, Art. 7 (part one), § 16(a), Rules Creating and Controlling the Oklahoma Bar Association. See *State ex rel. Oklahoma Bar Ass'n v. Braswell, supra* note 6 at 1232.

**9.** Canons 1, 2, 6 and 7 of the Code of Professional Responsibility, 5 O.S.1981, Ch. 1, App. 3, and the relevant disciplinary rules provided:

Canon 1. "A Lawyer Should Assist in Maintaining the Integrity and Competence of the Legal Profession"

DR 1–102(A)(1), (4), (5) and (6). "(A) *A lawyer shall not:* (1) *violate a disciplinary rule....* (4) Engage in conduct involving *dishonesty, fraud, deceit or misrepresentation.* (5) Engage in conduct that is *prejudicial to the administration of justice.* (6) Engage in any other conduct that *adversely reflects on his fitness to practice law.*" [Emphasis added.]
Canon 2. "A Lawyer Should Assist the Legal Profession in Fulfilling Its Duty to Make Legal Counsel Available"

DR 2–111(B)(4). "(B) A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters *shall withdraw from employment, if:* (4) *He is discharged by his client.*" [Emphasis added.] (Rules Governing Disciplinary Proceedings, 5 O.S.Supp.1983, Ch. 1, App. 3, renumbered DR 2–110 to make it DR 2–111 in the Oklahoma Statutes. The ABA continues to use the number DR 2–110.).
Canon 6. "A Lawyer Should Represent a Client Competently"

DR 6–101(A)(3). "(A) *A lawyer shall not:* * * * (3) *Neglect a legal matter entrusted to him.*" [Emphasis added.]
DR 6–102(A). "*A lawyer shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice.*" [Emphasis added.]

it constitutes a breach of good faith and fiduciary duty. Willful misrepresentation of professional performance in behalf of a client, when *no* service was in fact delivered, is reprehensible. A lawyer is guilty of *gross misconduct* when he (or she) deceives a client to the latter's injury.[11]

### Forgery

Colston was charged with forging the names of several parties on an entry of appearance and disclaimer. Forging signatures on legal documents is a serious breach of ethics. It constitutes illegal conduct marked by moral turpitude and justifies imposition of the most severe discipline.[12]

Canon 7. "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law"

DR 7–101(A)(1), (2) and (3). "(A) *A lawyer shall not intentionally:* (1) *Fail to seek the lawful objectives of his client* through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.
(2) *Fail to carry out a contract of employment* entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102 and DR 5–105.
(3) *Prejudice or damage his client during the course of the professional relationship* except as required under DR 7–102(B)." [Emphasis added.]

**10.** Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1–A, provides:
"The *commission by any lawyer of any act contrary to prescribed standards of conduct,* whether in the course of his professional capacity, or otherwise, *which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action,* whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline." [Emphasis added.]

**11.** *State ex rel. Oklahoma Bar Ass'n v. Raskin, supra* note 6 at 266–267.

**12.** In *State ex rel. Oklahoma Bar Association v. Hardey,* Okl., 495 P.2d 825 [1972], the respondent had forged the signatures of his clients to a

### Attempting To Limit Liability To A Client

Colston was charged with attempting to limit his liability to a client by offering her $5,000.00 in exchange for an agreement not to pursue the bar grievance. This is a clear violation of the Professional Responsibility Code, which warrants imposition of discipline. A member of the bar is guilty of misconduct when he (or she) attempts to exonerate himself from, or limit his liability to, a client for the commission of personal malpractice.[13]

## IV

## DISCIPLINE

Our primary object is to protect the public and to preserve its confidence in the legal profession as well as in the judicial authority charged with the licensing function. The relationship between a lawyer and a client calls for the exercise of the highest degree of integrity and fidelity. Nothing less will be tolerated.[14]

For the practice of their profession lawyers are licensed by this court. The maintenance of strict integrity among the members of our bar is one of this court's constitutional responsibilities.[15] Every licensed lawyer is presented to the public as a person worthy of confidence in his (or her) delivery of professional services. If a practitioner is shown to be unfit, it is this court's *duty*—for the public's immediate protection—promptly to withdraw from that individual the endorsement given to him (or her) by the license to practice.[16]

### Mitigating Circumstances

■ A disciplinary proceeding's purpose is not to punish but to inquire into the practitioner's continued fitness, with a view to safeguarding the interest of the public, of the courts and of the legal profession. Mitigating circumstances may be considered in arriving at the assessment of appropriate measure of discipline.[17]

■ Colston suggests that the PRT's two-year deferment of discipline is acceptable because, at the time of his misconduct, he was suffering severe trauma to his mental and emotional system from stress dealt by his personal and professional experiences. He maintains he has been, and is now, undergoing counseling and that he is presently in sufficient control of his emotional system and mental faculties to carry out properly the business of a legal practitioner. We disagree.

Proof of psychological and emotional trauma cannot be used *to shield Colston from amenability to disciplinary sanction.* While we reject this evidence as a vehicle for deferring the imposition of discipline, we do not recede from the notion that it may be invoked as an extenuating or mitigating factor in assessing the quantum of discipline to be imposed.[18] A lawyer's mental and emotional condition may be shown to demonstrate his capacity for rehabilitation and fitness to practice law, but it may not be used as a *complete barrier* to a legal practitioner's amenability to im-

settlement check and then converted the funds to his own use and benefit; the sanction of disbarment was ordered for this misconduct. See also *In re Milne,* 126 Vt. 69, 222 A.2d 360 [1966]; *In re Mahoney,* 59 Wash.2d 255, 367 P.2d 148 [1961].

**13.** See DR 6–102(A), *supra* note 9.

**14.** *State ex rel. Oklahoma Bar Ass'n v. Raskin, supra* note 6 at 267.

**15.** *State ex rel. Oklahoma Bar Ass'n v. Raskin, supra* note 6 at 267.

**16.** *State ex rel. Oklahoma Bar Ass'n v. Harlton,* Okl., 669 P.2d 774, 777 [1983]; *State ex rel.*

*Oklahoma Bar Ass'n v. Raskin, supra* note 6 at 267.

**17.** *State ex rel. Oklahoma Bar Ass'n v. Moss,* Okl., 682 P.2d 205, 207 [1983]; *State ex rel. Oklahoma Bar Ass'n v. Harlton, supra* note 16 at 777; *State ex rel. Oklahoma Bar Ass'n v. Raskin, supra* note 6 at 267.

**18.** See Annot.: *Mental or Emotional Disturbance as Defense to or Mitigation of Charges Against Attorney in Disciplinary Proceeding,* 26 ALR 4th 995 [1983]; *In re Conduct of Loew,* 292 Or. 806, 642 P.2d 1171, 1173–1174 [1982]; *In re Barry,* 90 N.J. 286, 447 A.2d 923, 925–926 [1982]; ABA/BNA Lawyers' Manual on Professional Conduct, 101:3201–3301 [1984].

**926**

mediate sanctions for professional misconduct.

### Measure Of Discipline

 Considering Colston's emotional and mental state of mind as mitigating factors, we are ineluctably led to believe that suspension for any period is not a fit sanction for misconduct of the enormity shown by this record. This is not a case of a single isolated occurrence of deviant conduct by a lawyer with an otherwise unblemished record. We are confronted here with a five-year pattern of highly *deceptive practices* having serious adverse financial consequences to the clients and to others. These practices took many forms—the forging of adverse parties' appearances, fraud in obtaining public officials' signatures, neglect of clients' legal matters and false representations about the status of cases. The enormity and severity of the harmful misconduct shown by the record damages the whole profession's image as a licensed community of practitioners worthy of public trust. Maintenance of public confidence in this court as a reliable licensing authority and in the bar as a whole mandates severe discipline for Colston's deceptive and harmful practices. The risk to the public is far too great to countenance less than a complete severence of the offending practitioner from the ranks of the practising community. Colston's disbarment is the only means of affording the public the requisite modicum of protection.

PRT'S RECOMMENDATION IS REJECTED; RESPONDENT IS DISBARRED AND ORDERED TO BEAR THE COSTS OF THIS PROCEEDING, WHICH SHALL BE DUE WHEN THIS OPINION BECOMES FINAL.

HARGRAVE, C.J., and LAVENDER, SIMMS and DOOLIN, JJ., concur.

HODGES, ALMA WILSON, KAUGER and SUMMERS, JJ., concur in part and dissent in part.

KAUGER, Justice, concurring in part and dissenting in part:

I would remand for proceedings under 5 O.S.1981, Ch. 1, App. 1–A, Rule 10.