2008 OK 60

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Michael GASSAWAY, a.k.a. John Michael Gassaway, Respondent.**

**SCBD No.4912.**

Supreme Court of Oklahoma.

June 17, 2008.

Dan Murdock, General Counsel, Oklahoma Bar Association; Loraine Dillinder Farabow and Janna Dunagan Hall, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant, State of Oklahoma ex rel. Oklahoma Bar Association.

William H. Bock and Michelle L. Greene, Oklahoma City, OK, for Respondent.

John Michael Gassaway, Oklahoma City, OK, pro se Respondent.

**WINCHESTER, C.J.**

¶ 1 This matter arises from multiple counts of alleged attorney misconduct by the respondent, John Michael Gassaway (Respondent). Complainant, the Oklahoma Bar Association (OBA), filed its initial complaint on March 26, 2004, alleging three counts of misconduct, and an amended complaint on January 18, 2007, alleging an additional twelve counts of misconduct. A panel of the Professional Responsibility Tribunal (PRT) conducted a hearing over the course of several days in which voluminous testimony and evidence were presented.[1] The PRT found clear and convincing evidence of attorney misconduct in six of the fifteen counts and recommended disbarment. An application for costs was filed by the OBA in the amount of $17,587.92.

## JURISDICTION AND STANDARD OF REVIEW

¶ 2 In bar disciplinary proceedings, this Court possesses exclusive original jurisdiction. *State ex rel. Oklahoma Bar Ass'n v. Holden*, 1995 OK 25, ¶ 10, 895 P.2d 707, 711. Our review of the evidence is de novo in determining if the Bar proved its allegations of misconduct by clear and convincing evidence. RGDP Rule 6.12(c); *State ex rel. Oklahoma Bar Ass'n v. Bolusky*, 2001 OK 26, ¶ 7, 23 P.3d 268, 272. Whether to impose discipline is a decision that rests solely with this Court and the recommendations of the PRT are neither binding nor persuasive. *State ex rel. Oklahoma Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 8, 914 P.2d 644, 648.

¶ 3 The primary purpose of disciplinary proceedings is not punishment but purification of the Bar. *State ex rel. Oklahoma Bar Ass'n. v. Samara*, 1984 OK 32, ¶ 11, 683 P.2d 979, 983. This Court's primary goal is to protect the public and to preserve its confidence in the legal system. *State ex rel. Oklahoma Bar Ass'n. v. Colston*,

---

1. The Respondent raised several motions before the PRT and also filed an original action in the Supreme Court. All of these motions were denied and have not been re-asserted by the parties and, as such, will not be addressed herein.

1989 OK 74, ¶ 18, 777 P.2d 920, 925. The maintenance of strict integrity among the members of our bar is one of this Court's constitutional, non-delegable duties. *Colston,* 1989 OK 74, ¶ 19, 777 P.2d at 925. We have reviewed the evidence and find the record sufficient for our de novo consideration.

## FACTS AND DISCUSSION

### Counts I and II: Judge Tammy Bass–Lesure and the Richard Smith Matter

#### A. Background

¶ 4 On June 17, 2002, shortly after Respondent's license to practice law had been reinstated following a 1995 resignation pending disciplinary action, Richard Smith (Smith) retained Respondent to represent him in a criminal matter. Smith had pled guilty fourteen (14) years prior to thirteen (13) counts of felony embezzlement by a trustee and was given a suspended sentence of fifteen (15) years supervised probation and ordered to pay restitution of over forty thousand dollars ($40,000) due and payable by the end of his sentence. At the time he sought Respondent's assistance, Smith's sentence had less than one year to run and the full amount of his restitution remained due.

¶ 5 On July 24, 2002, Respondent appeared in the chambers of Judge Tammy Bass–Lesure (then Tammy Bass–Jones) to present an application to correct sentence along with a proposed order. Judge Bass–Lesure testified that Respondent stated he was before her on one of Scott Adams' cases and that he was presenting a motion for modification.[2] Judge Bass–Lesure further testified that Respondent informed her Smith was a disabled veteran with significant health issues and that he was seeking to remove Smith's required monthly supervision fee from the suspension order which would allow him to apply those monies instead towards his restitution debt.[3]

¶ 6 Judge Bass–Lesure testified Respondent told her that the District Attorney's office had been notified of the motion so she asked Respondent to go find the Assistant District Attorney (ADA) and have her appear. Judge Bass–Lesure stated that when Respondent returned to her chambers, he informed her that the ADA would not be appearing. Judge Bass–Lesure then signed the proposed order. She testified that Respondent took the order and left her office.

¶ 7 An order dated July 24, 2002, was filed in the matter with Judge Bass–Lesure's signature appearing as the only item on the last page of the order.[4] Judge Bass–Lesure testified she believed she was only modifying Smith's probation from supervised to unsupervised as the Respondent had discussed with her. However, the file-stamped order was substantially different than the version she believed she signed. Indeed, the order on file changed Smith's sentence from three consecutive five year suspended sentences to a deferred sentence, and also completely absolved Smith of his $40,000 restitution obligation.

¶ 8 Smith testified that he took a copy of the order to the Oklahoma State Bureau of Investigation (OSBI) and requested that his criminal record be expunged. The OSBI then contacted the District Attorney's office who in turn contacted Judge Tammy Bass–Lesure to verify the accuracy of the order because they believed it to be a forgery. Judge Bass–Lesure testified it was not a forgery, because it was her signature, but that she would not have signed the order if what she had been presented indicated that she was changing a sentence from suspended to deferred, nor would she have forgiven over $40,000 in restitution. As a result, Judge Bass–Lesure rescinded her order, specifically citing misrepresentations by Respondent as the reason for the rescission. Smith was later arrested for failure to pay the court-ordered restitution.

---

2. Scott Adams testified he never represented Smith and Respondent denies saying that he did.

3. To remove the monthly supervision fee, Smith's status would need to change from supervised to unsupervised probation.

4. Judge Bass–Lesure testified she believes Respondent modified the body of the order after she signed it and, as a result, she will no longer sign any order where her signature block is the only item appearing on a page.

¶ 9 Respondent denies Judge Bass–Lesure's recollection of the events. He testified the judge carefully read the application and order and signed it because she was upset with the District Attorney's office for not appearing with Respondent on the matter.[5] Respondent further testified that he never told the judge the District Attorney's office had been notified nor did the judge ever ask. Respondent testified he "had skinned me a pretty quick cat" and that Judge Bass–Lesure was lying to cover for herself.

## B. Analysis

¶ 10 The Trial Panel found Complainant proved Respondent's violations of Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication with client), 3.1 (meritorious claims and contentions), 3.3 (candor toward the tribunal), 3.5(b) (ex parte communications with a judge), 8.4(a) (violation or attempted violation of the ORPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), and 8.4(d) (conduct prejudicial to the administration of justice) of the Oklahoma Rules of Professional Conduct (ORPC) and Rule 1.3 (acts contrary to prescribed standards of conduct) of the Rules Governing Disciplinary Proceedings (RGDP). We agree.

¶ 11 The evidence reflected that Respondent, less than two months after having his license to practice law reinstated by this Court, was once again engaging in fraudulent conduct as he had in past disciplinary matters before the OBA. In weighing the credibility of the testimony presented by Judge Bass–Lesure and that of Respondent, a felon previously convicted of fraudulent activity, we find Respondent's testimony unbelievable. Moreover, we find that although Mr. Smith testified he was satisfied with Respondent's representation, Respondent's unethical tactics resulted in Smith's arrest and prolonged his legal woes.

▇ ¶ 12 Obtaining the signature of a judge under fraudulent conditions is a serious breach of ethics that clearly reflects moral turpitude. *State ex rel. Oklahoma Bar Association v. Colston,* 1989 OK 74, ¶ 16, 777 P.2d 920, 924. Respondent knowingly and

willingly engaged in dishonest conduct by: (1) misrepresenting the nature of his visit to Judge Bass–Lesure; (2) untruthfully claiming that he had informed the assistant district attorney, not only of the newly pending motion, but of the opportunity to be heard before the judge; and (3) misleading Judge Bass–Lesure into believing that her executed order was merely modifying the structure of Smith's probation fees when Respondent instead filed an order with substantially greater legal consequences. We find the evidence on these two counts to clearly and convincingly establish the charged violations.

### Count III: Forgery of Scott Adams' Letterhead

### A. Background

¶ 13 In October 2003, the OBA notified Respondent they were formally investigating a grievance that had been filed against him. On January 12, 2004, the OBA received a response to the grievance that appeared to be a letter written and signed by attorney Scott Adams. The letter was printed on Adams' letterhead and contained a signature block that was purportedly signed by Adams. The letter demanded, in part, that the OBA either dismiss the grievance against Respondent or open a similar investigation against Adams.

¶ 14 An OBA investigator testified that the language and tone of the letter was not consistent with previous letters received by the OBA from Adams during his prior representation of attorneys involved in bar proceedings. This suspicion led the OBA to further scrutinize the letterhead and signature of Adams. It was discovered that the letterhead did not match other letters from Adams nor was the paper of the same quality. Moreover, the signature was illegible and inconsistent with the signature on Adams' prior letters.

¶ 15 Adams testified that he neither drafted nor signed the letter. Adams further testified that he did not authorize the use of his letterhead or signature to anyone outside his office, including Respondent. Respon-

---

**5.** The evidence showed that the District Attorney's office had not in fact been notified of the application or order, both of which were file-stamped the same day.

dent testified that because Adams was out of town, Respondent drafted the letter, gave it to Adams' secretary and asked her to obtain Adams' approval. Respondent stated that Adams' secretary told him that Adams approved the letter so Respondent then signed Adams' name "by MG." Adams' secretary denied seeing the letter or asking for Adams' approval. Respondent stated he had several pages of Adams' stationery from years ago when he worked for him as a clerk although the letterhead was different than all of the other stationery produced by Adams and Adams could not remember ever using letterhead similar to that on the letter in question.

### B. Analysis

¶ 16 In this count, Respondent was charged with violating Rules 8.1(b) (failure to correct misapprehension in disciplinary proceeding), 8.4(a) (violation or attempted violation of the ORPC), and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the ORPC and Rules 1.3 (acts contrary to prescribed standards of conduct) and 5.2 (deliberate misrepresentation in connection with bar investigation) of the RGDP. We find that the OBA proved by clear and convincing evidence that Respondent had no authority to execute the letter he purported to sign on Adams' behalf. Respondent's conduct demonstrates a clear disregard to his ethical obligations and warrants discipline by this Court.

### Count IV: The Rogers' Grievance

### A. Background

¶ 17 Rhonda Rogers (Rogers) retained Respondent to represent her in a divorce involving custody and support of minor children. Respondent filed a petition for Rogers and prepared a waiver of service of summons for Rogers' husband. As instructed by Respondent, Rogers took the waiver and petition to her husband who executed the waiver. While the waiver validly waived "the issuance and service of summons," it reserved "all other rights."

¶ 18 On November 13, 2002, Respondent took Rogers with him to the courthouse to file the waiver of service and finalize the divorce. Rogers testified she asked Respon-

dent about the need of her husband to sign the divorce decree and that Respondent seemed unhappy when he realized her husband's signature was not on the decree. Rogers testified Respondent wrote "waiver signed" in the space for her husband's signature and told her just to "follow [his] lead."

¶ 19 Respondent next took Rogers to the uncontested/waiver divorce docket where they appeared before Judge David Cook in Oklahoma County. Judge Cook granted the divorce as requested.

¶ 20 Respondent testified that Rogers' husband was in default for not having filed an answer and that Judge Cook granted the divorce on that basis. Respondent stated he told Judge Cook there was a waiver but that the waiver did not waive any defenses as it was merely a waiver of service, but that the husband was in default for failure to answer. Respondent stated Judge Cook was the one that instructed him to write "waiver on file" on the husband's signature block.

¶ 21 The November 13, 2002 divorce decree awarded the home, custody and child support to Rogers. On June 15, 2004, Rogers' husband filed a motion to vacate or modify the decree alleging the decree had been obtained by fraud and that he had not received proper notice. On March 15, 2005, the court sustained, in part, the motion to vacate, vacating the entire decree with the exception of the granting of the divorce. Following this order, Rogers and her husband engaged in a lengthy court battle over the marital assets and child support.

¶ 22 Rogers filed a grievance against Respondent alleging neglect and misconduct in the handling of her case. Respondent's written response to the OBA asserted in part that he "did not review the entry of appearance and waiver close enough to determine that in truth and fact the waiver itself was apparently insufficient to waive any defenses."

### B. Analysis

¶ 23 The PRT found that Respondent violated Rules 1.1 (competence), 3.3(a)(1) (false statements to the tribunal), 8.4(a) (violation or attempted violations of the ORPC), 8.4(c)

(conduct involving dishonesty, fraud, deceit or misrepresentation), and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and Rule 1.3 (acts contrary to prescribed standards of conduct) of RGDP. We agree that the OBA proved Respondent grossly mishandled Rogers' divorce.

¶ 24 Just a few short months after committing similar fraudulent tactics in the Smith matter, in Counts I and II, Respondent continued his pattern of deceit. Respondent's misrepresentations to Judge Cook caused an erroneous divorce decree to be entered in this case which ultimately cost Rogers' two additional years of litigation and significantly increased her legal fees. The OBA clearly and convincingly proved the Respondent violated the rules as alleged in this count.

### Count V: The Lathrop Grievance

### A. Background

¶ 25 Randa Lathrop (Lathrop) retained Respondent to represent her in a child custody dispute. Respondent filed a motion to modify the joint custody plan as well as an application for contempt citation against the father. According to Lathrop, Respondent advised her not to allow the father to see or have custody of the child before the court hearing on the matter set for February 2, 2005. Lathrop testified that she followed this advice and that the tension between the parties escalated. The father likewise filed for contempt against Lathrop for her failure to comply with the custody plan in force.

¶ 26 Respondent testified that he told Lathrop the protection of the child comes first and to withhold visitation if she "felt the child was in danger."[6] He also testified that he informed Lathrop she could get a cross-citation for contempt if she refused visitation to the father.

### B. Analysis

¶ 27 The OBA charged Respondent with violating Rules 1.1 (competence), 1.4(a) (reasonable consultation with client about objectives, status, and requested information), 1.4(b) (explanation of matters to client to permit informed decisions), and 8.4(a) (violation or attempted violations of the ORPC) of the ORPC and Rule 1.3 (acts contrary to prescribed standards of conduct) of the RGDP. We find, as did the PRT, that the OBA failed to meet its burden of proof on this count.

### Count VI: The C.D. Matter[7]

### A. Background

¶ 28 In January 2006, after the arrest of her boyfriend, Luther Blankenship (Blankenship), C.D. met with Respondent to discuss her boyfriend's case. C.D. arranged for Respondent to represent Blankenship, signed the contract with Respondent on Blankenship's behalf, and paid Respondent $200 towards his $2500 fee. C.D. had allegedly been referred to Respondent by a former co-worker named Marquita.

¶ 29 After one of the initial meetings with Respondent, C.D. was arrested on drug possession charges. Instead of facing criminal prosecution for the drug charges, C.D. became an informant for the Oklahoma City Police Department (OCPD) and told them she believed Respondent would trade out legal services for sexual favors. C.D. agreed to help OCPD build a case against Respondent.

¶ 30 Thereafter, on or about March 1, 2006, C.D. met with Respondent at his law office to discuss an upcoming March 23, 2006 court date.[8] At this meeting, C.D. informed Respondent that she and Blankenship were short on money. C.D. told him she worked with Marquita and wondered if there was

---

6. Respondent testified Lathrop informed him that the father was a meth addict, bi-polar and not taking his medication.

7. Because of the sensitive nature of the allegations in Counts VI, and VIII through XII, the names of the individuals have been replaced with initials.

8. OCPD provided C.D. a wire to wear during her meetings with Respondent. The evidence included an audiotape recording of the conversation between Respondent and C.D. We find that the tape merely corroborates certain aspects of the conversation between C.D. and Respondent as testified to by C.D.

something they could work out.[9] Respondent agreed and asked C.D. to return to his office the next afternoon around 5 p.m.

¶ 31 C.D. returned to Respondent's office the next day, again wearing a wire and carrying a recording device in her purse.[10] After a short discussion in Respondent's office with the door locked, Respondent agreed to give C.D. a $300 credit toward Blankenship's legal fee for each "blow job" she gave Respondent.[11] C.D. testified that Respondent then unzipped and pulled down his pants. Shortly

9. C.D. claimed that Marquita had told her that Respondent would trade out legal services for sexual favors.

10. In addition to the official recording device in her purse, C.D. testified that she was also given a decoy recording device in case Respondent discovered it.

11. The conversation was transcribed and is set forth, in pertinent part, below:

MG: All right. What's gonna be our program girl?
CD: Um, I, I don't know. I was gonna ask what you would suggest. I mean, I didn't ...
MG: You just tell me.
CD: Well, I, I was kind thinking maybe being on that program that uh, Marquita was on.
MG: Uh huh.
CD: If that was okay?
MG: Uh huh.
CD: Um, I just didn't know, really, what um, you know, um, I guess what you would expect, or what you wanted or ...
MG: Well, how much credit do you want for each time?
CD: Well see, that's what I was gonna ask you. I didn't know how that would work. How much credit ...
MG: It's your price baby.
CD: It's my per ... Well, how many, well, how many times would it take for me to get it paid off?
MG: How much do you owe?
CD: Well, I've only paid two hundred down.
MG: Okay. And your fee is twenty five hundred right?
CD: Correct. Yeah. So I don't know how you might want to work that out.
MG: Well, you just tell me what your rate is.
CD: Um, it normally, um, see, I've done three hundred, or I used to. I mean, I haven't done that in a while. I used to be an escort. I haven't done it in a while, but ... Can I ... I don't know if that's out of range now, or not ...
MG: Name your price baby. It's your rate.
CD: Okay.
MG: So everytime it's three hundred on the book.
CD: Okay.
MG: All right.
CD: And um, when, I started to say, I didn't know when you wanted to, like if it's preferred in a certain place, cuz I'm kinda like, I don't know like, in the office, or ...

MG: You bet. They'll be gone here in about five minutes. Can you stick around?
CD: Oh yeah. I'm not ...
MG: Soon as I clear it out.
CD: Yeah, and also, yeah that's the only thing I was kinda nervous cuz I was like, oh ...
MG: And get a blow job, and we're good. All right?
CD: Do what?
MG: I said we'll get em cleared out of here. Get a blow job, we're good.
. . . . . . . . . .
CD: Was just kind of nervous.
MG: Okay, well, don't worry about it.
CD: Okay. They're not there?
MG: I'll lock the door. They're all gone. Come here.
CD: What if they're still here?
MG: They're gone.
CD: Oh are they? I'm ... All right. (Inaudible) I'll take off my jacket and then we'll get the party started. (Inaudible)
MG: Kind easy money for you girl.
CD: Yep. Okay. I'm gonna take off my earrings,
MG: All right.
CD: Not good. They'll accidentally stab ya.
MG: That's some big ol earrings.
CD: I know. I've accidentally um, left em, the wrong earrings, not on purpose, and you just want to do that right there?
MG: Yeah, sure.
CD: Okay. Ow. I've accidentally done that. You want me fully clothed?
MG: It don't make any difference babe.
CD: Why am I so nervous?
MG: I don't know.
CD: Okay. And this if definitely gonna help him get off?
MG: It's gonna pay his fees. Absolutely.
CD: Okay. And you think we can finish ...
MG: I think we can handle it.
CD: Okay.
MG: All right?
CD: All right. One second. Why am I nervous?
MG: I don't know.
CD: Sorry.
MG: If you don't wanna do it, don't do it.
CD: Um, I don't know, I was just trying to think ... like I ... I know (inaudible)
MG: Well then don't do it baby. If you don't want to do it, don't do it.
CD: I know.
MG: It ain't no big deal.
CD: No, I will. Oh ... I'm nervous. Yes, I'm sorry. I need to quit postponing. Get it started.

thereafter, and upon C.D.'s use of the trigger phrase,[12] OCPD knocked on Respondent's office door and C.D. placed him under citizens' arrest. C.D. testified that when Respondent heard the knock on the door he jumped up to pull up his pants and searched her purse to try to destroy any recording of their conversation.[13]

¶ 32 Respondent faced a criminal trial in the District Court of Oklahoma County for misdemeanor charges of soliciting prostitution. Respondent's criminal defense relied on the argument that C.D. initiated the sexual offer and that, while Respondent's conduct was admittedly "disgusting, immoral and unprofessional," C.D. was the one to make the offer rendering the charge of solicitation against him untenable. Respondent was acquitted of the criminal charges.

¶ 33 In the bar proceeding, Respondent denied that he intended to actually engage in any sex act with C.D. He testified that he ultimately planned to let C.D. do something else, such as "wash his windows." He claimed that when OCPD knocked on the door, C.D. unzipped his pants and pulled

them down. Respondent maintained OCPD had a vendetta against him.

## B. Analysis

¶ 34 The OBA charged Respondent with violations of Rules 1.5 (reasonable fees), 8.4(a) (violation or attempted violations of the ORPC), 8.4(b) (criminal acts reflecting adversely on lawyer's honesty, trustworthiness, or fitness) and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the ORPC and Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP. By his own admission in the criminal case, Respondent's conduct in relation to this count brought discredit upon the legal profession in violation of Rule 1.3, RGDP.[14] Indeed, his criminal defense characterized his conduct as immoral, disgusting and unprofessional. We agree.

■■■ ¶ 35 A lawyer is a fiduciary with a duty of loyalty, care, and obedience to the client. The relationship is, and must be, one of utmost trust.[15] This Court has previously recognized that sexual advances in the attorney-client relationship are contrary to the prescribed standards of conduct.[16] In *State*

---

12. C.D. testified that she was to use the phrase "[l]et's get this party started" when she was ready for OCPD to enter the office.

13. The testimony reflected that Respondent destroyed the decoy tape.

14. Rule 1.3 provides: "The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline."

15. Respondent stresses that C.D. was not his client. This point is not well taken as this Court has recognized that discipline may be imposed for occurrences outside the attorney-client relationship. *See State ex rel. Oklahoma Bar Association v. Garrett*, 2005 OK 91, 127 P.3d 600; *State ex rel. Oklahoma Bar Association v. Foster*, 2000 OK 4, 995 P.2d 1138. Moreover, it is significant to point out that C.D. was dealing with Respondent on behalf of Blankenship, Respondent's client, and all of the meetings between C.D. and Respondent occurred in Respondent's office while discussing the status of Blankenship's case. Clearly, Respondent was putting his own inter-

ests ahead of those of his client, Blankenship, in violation of several ethical standards.

16. *See, e.g., State ex rel. Oklahoma Bar Association v. Wilburn*, 2006 OK 50, 142 P.3d 420 (public reprimand for inappropriate touching and comments in two instances); *State ex rel. Oklahoma Bar Association v. Anderson*, 2005 OK 9, 109 P.3d 326 (lawyer suspended for one year for engaging in inappropriate sexual relations with client); *State ex rel. Oklahoma Bar Association v. Downes*, 2005 OK 33, 121 P.3d 1058 (lawyer's sexual advances toward a client exploit the attorney-client relationship and constitute professional misconduct worthy of discipline); *State ex rel. Oklahoma Bar Association v. Garrett*, 2005 OK 91, 127 P.3d 600 (lawyer pled guilty to two misdemeanor sexual battery charges and received public censure and one year probation); *State ex rel. Oklahoma Bar Association v. Groshon*, 2003 OK 112, 82 P.3d 99 (attorney received public reprimand for suggestive comments and inappropriate touching of client); *State ex rel. Oklahoma Bar Association v. Foster*, 2000 OK 4, 995 P.2d 1138 (public reprimand for inappropriate viewing of minor's breasts and inappropriate comments); *State ex rel. Oklahoma Bar Association v. Miskovsky*, 1997 OK 55, 938 P.2d 744 (lawyer suspended for sixty days for use of sexually explicit and inappropriate language); *State ex rel. Oklahoma Bar Ass'n v. Copeland*,

*ex rel. Oklahoma Bar Association v. Wilburn,* 2006 OK 50, ¶ 13, 142 P.3d 420, we held that "inappropriate touching and sexually suggestive gestures and remarks will not be tolerated, regardless of whether they seem harmless, solicited or consensual."

¶ 36 This is the first case we have been presented where the sexual misconduct by the attorney involved trading sexual favors for legal services. The Supreme Court of Louisiana disbarred an attorney for making unwanted sexual demands on six female clients, including soliciting sexual favors in lieu of legal fees. *In re Touchet,* 753 So.2d 820 (La.2000). The court held:

> By attempting to sexually exploit his clients, respondent unquestionably violated his professional duty to protect their interests. Respondent's conduct is made even more reprehensible by the fact that many of his clients consulted him in connection with emotionally-charged domestic matters, and respondent attempted to use their vulnerability to further his sexual interests.

*In re Touchet,* 753 So.2d 820 (La.2000).

¶ 37 In the instant matter, Respondent placed his personal, prurient interests above the interests of his client and C.D. Respondent knew of their financial plight and sought to take advantage of them by furthering his sexual desires. Certainly, the public should not be subjected to such offensive behavior conducted under the authority of a license to practice law. We find by clear and convincing evidence that Respondent's conduct violated the ORPC and the RGDP.

### Count VII: Respondent's Criminal Arrest and Prosecution
#### A. Background

¶ 38 It appears that Complainant, in Count VII, alleges that the publicity arising from Respondent's criminal case damaged the reputation to the legal profession and should be treated as a separate offense apart from that alleged in Count VI. In addition, Complainant argues Respondent "purposefully and intentionally delayed his criminal proceedings and thus, his disciplinary matter."

#### B. Analysis

¶ 39 In this count, the OBA charged Respondent with violations of Rule 8.4(a) (violation or attempted violations of the ORPC) and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the ORPC and Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP. While we agree that Respondent's actions relating to Count VI certainly damaged the reputation of the legal profession, we will administer the appropriate discipline for this misconduct as it pertains to that count rather than pursuant to a redundant count as requested here.

¶ 40 Additionally, we find the OBA failed to provide clear and convincing evidence that Respondent intentionally delayed the prosecution of his criminal case.

### Count VIII: The M.H. Matter
#### A. Background

¶ 41 In October 2004, Dr. Richard Gaither (Gaither), a dentist, retained Respondent to represent him in a hearing before the Dental Board. Respondent met with Gaither and his wife, M.H., on several occasions to discuss Gaither's case. M.H. contacted the OBA after seeing reports in the news regarding Respondent's criminal solicitation case. M.H. testified that Respondent made multiple sexual advances toward her and that she

1994 OK 21, 870 P.2d 776 (taking advantage of attorney-client relationship by offensively touching client warrants public reprimand); *State ex rel. Oklahoma Bar Association v. Sopher,* 1993 OK 55, 852 P.2d 707 (attorney's sexual advances toward client and her mother held inappropriate and worthy of discipline). Other states have disbarred attorneys for sexual misconduct. *See, e.g., In re Touchet,* 753 So.2d 820 (La.2000)(attorney's unwanted sexual demands on six female clients, soliciting sexual favors in lieu of legal fees, warranted disbarment); *Matter of Berg,* 264 Kan. 254, 955 P.2d 1240 (1998)(attorney disbarred for engaging in inappropriate sexual behavior with numerous clients who were very vulnerable and for committing a sexual battery on one client; *Matter of Disciplinary Proceedings Against Heilprin,* 168 Wis.2d 1, 482 N.W.2d 908 (1992), cert. denied, 506 U.S. 972, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992)(attorney who had previously been suspended for sexual misconduct was subsequently disbarred when he directed sexually explicit comments and suggestive questions to two female clients during office conferences).

performed oral sex on Respondent. M.H. stated she believed she would be helping her husband's case.

¶ 42 Respondent denied the accusations and testified that M.H. had a history of lying and other psychological problems. M.H.'s testimony in this proceeding as well as in her husband's dental board case reflect multiple conflicting stories and lies told by M.H. The record reflects M.H. admitted to telling previous lies under oath.

**B. Analysis**

¶ 43 We agree with the PRT that the OBA failed to meet its burden of proof on this count.[17] In addition to reviewing testimony previously given by M.H. in her husband's dental hearings, the PRT was able to see M.H. testify in person and weigh her credibility firsthand. Although the facts underlying previous counts against Respondent weaken his position here, the allegations made by M.H., an admitted liar, were not believable. The OBA failed to establish by clear and convincing evidence that Respondent violated any rules in this count.

**Count IX: The M.W. Matter**

**A. Background**

¶ 44 M.W., a former client of Respondent's, contacted the OBA after seeing the news of Respondent's criminal arrest. M.W. had previously retained Respondent to help her in a child custody dispute. Respondent represented M.W. in various criminal matters as well.

¶ 45 M.W. complained that she believed Respondent wanted her to have sex with him in exchange for his continued legal representation because after a hearing in February 2004 he asked her to stop by his office and "talk sweet to him." She did not stop by his office and her child custody case was later transferred to a Kansas state court.

¶ 46 Respondent testified that he resolved each of M.W.'s legal matters. He testified

that M.W. did owe him legal fees and admitted he probably said something like she needed to "talk sweet to him" but stated that he said this because M.W. was a "headstrong lady who spit a lot of venom." Respondent denied any inappropriate behavior regarding his representation of M.W.

**B. Analysis**

¶ 47 Respondent was charged with violating Rules 1.1 (competence), 1.4 (communication with client), 1.5 (reasonable fees), 1.7(b) (conflict of interest—sexual relations prohibited), 1.8(b) (conflict of interest—use of information to the disadvantage of the client), 2.1 (scope of advice), 8.4(a) (violation or attempted violations of the ORPC) and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP. We agree with the PRT that neither the Respondent's ill-advised use of the phrase "come and talk sweet to me" nor any of Respondent's other actions relating to this count rise to a violation of the rules. We find the OBA failed to meet its burden of proof on this count.

**Count X: The T.B. Matter**

**A. Background**

¶ 48 Sometime in 2002, T.B. hired Respondent to represent her in a divorce proceeding. T.B. testified that in January or February, 2002, she paid Respondent a $3000 retainer but she could produce no check, receipt or other documentation as evidence of this payment. T.B. claims that she went to Respondent's office to fire him for inaction on her case and that as she was speaking to him from across his desk he was fondling himself.

¶ 49 T.B. testified that Respondent told her he could speed up her case if she engaged in oral sex with him. T.B. claims to have demanded her money back and left his office. She maintains that she contacted the OBA about Respondent's conduct but there

---

17. The OBA charged Respondent with violations of Rules 1.5 (an attorney must charge reasonable fees), 8.4(a) (violate or attempt to violate ORPC), 8.4(b) (criminal acts reflecting adversely on lawyer's honesty, trustworthiness, or fitness) and

8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the ORPC and Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP.

was no record of such a call. T.B. testified that Respondent's conduct caused her to lose "everything" including her home.

¶ 50 Respondent denied T.B.'s version of facts and testified that he could not have met with T.B. when she alleged as he was not yet back to practicing law in 2002 until June. He further testified that he was hired by T.B. but that this occurred in August, 2002, and that he withdrew from her case after she neglected to pay him. Other evidence revealed that T.B.'s home was foreclosed upon in 2001, well before Respondent's representation of her.

### B. Analysis

¶ 51 In Count X, the OBA charged Respondent with violating Rules 1.1 (competence), 1.3 (diligence), 1.5 (reasonable fees), 1.7(b) (conflict of interest—sexual relations prohibited), 1.8(b) (conflict of interest—use of information to the disadvantage of the client), 1.16(a)(1) (withdrawal of representation), 2.1 (scope of advice), 8.4(a) (violation or attempted violations of the ORPC) and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP. T.B. offered conflicting testimony regarding the dates of Respondent's representation of her. She claimed that Respondent represented her at a time when he was not practicing law and also that Respondent caused her to lose a home that was foreclosed upon several months before she met Respondent. We agree with the PRT that the OBA failed to support its allegations with clear and convincing evidence.

### Count XI: The K.Q. Matter
### A. Background

¶ 52 K.Q. testified that over the course of several years, and while Respondent represented her in various legal matters, she and Respondent had sexual relations. K.Q. testified that she first sought Respondent's assistance in a divorce matter in 1997. She claims she stopped by his office to discuss her case and that Respondent made sexual advances toward her and that they had sexual intercourse. K.Q. stated that Respondent referred her to another attorney since he was

disbarred at that time. Over the next few years, K.Q. testified that she was arrested on multiple occasions for alcohol-related driving offenses and Respondent arranged for her representation with other attorneys but stated that she and Respondent continued to have sexual relations.

¶ 53 Respondent testified that he did not meet K.Q. until 2000 when his friend, R.D. Diener (Diener), an owner and operator of gun shows, introduced them at one of his gun shows. Diener testified that K.Q. was an employee of his with whom he had an affair and for whom he eventually divorced his wife. Diener testified that he had paid all of K.Q.'s legal bills and that Respondent did not represent K.Q. in her divorce or any of her DUI cases. Diener stated that he paid Respondent to represent K.Q. on one matter after Respondent's license had been reinstated.

¶ 54 Diener testified that while they were dating, K.Q. had an affair with Nyle Taylor (Taylor) and that K.Q. conspired with Taylor and a third assailant to rob him in his home. Diener testified that K.Q. called Taylor to alert him that Diener would be coming home with the money from his gun show and that upon arriving home Diener was attacked and severely beaten. Diener stated that Taylor was convicted of home invasion and sent to prison. Diener then hired Respondent to file a civil suit against Taylor and K.Q. Diener stated he won a judgment of $500,000 against Taylor and K.Q.

¶ 55 Respondent denied any sexual relations with K.Q. Moreover, various documents were introduced into evidence contradicting K.Q.'s dates of his alleged representation of her.

### B. Analysis

¶ 56 Respondent was charged with violating Rules 1.1 (competence), 1.5 (reasonable fees), 1.7(b) (conflict of interest—sexual relations prohibited), 1.8(b) (conflict of interest—use of information to the disadvantage of the client), 2.1 (scope of advice), 8.4(a) (violation or attempted violations of the ORPC) and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and

Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP. The PRT found K.Q.'s testimony to be unbelievable and that K.Q. had her own motives to see Respondent get into trouble. The evidence clearly contradicted several of K.Q.'s versions of events. Weighing the testimony of Respondent and Diener, and the evidence submitted, we agree that K.Q.'s testimony was not credible. The evidence and testimony presented fails to prove the OBA's allegations against the Respondent by clear and convincing standards.

### Count XII: The A.M Matter

#### A. Background

¶ 57 In 1994, A.M. was arrested for public intoxication and two counts of possession of a controlled dangerous substance. She hired Respondent to represent her. A.M. admitted she stopped contacting Respondent because she had no money to pay him. Respondent then filed a motion to withdraw. A.M. testified that she informed Respondent she had no money to pay him and that he responded "I guess the only thing you have left to trade is your hide" and that she should meet him at his office at 5:00 p.m. A.M. testified that she did not keep the appointment with Respondent and instead filed an application for a public defender and intended to tell the judge what Respondent had said to her.

¶ 58 On the date of the proceedings, Respondent met A.M. at the courthouse and informed her that he had obtained a deferred sentence for her and that her case was then over. A.M. never paid any monies to Respondent and Respondent testified he told her never to come back to his office again. Respondent denied that his "hide" comment was intended to elicit sexual favors from A.M. and stated that he had never made any sexual advances toward her.

#### B. Analysis

¶ 59 This count arose from Respondent's representation of A.M. back in 1994. A.M. came forward with her testimony after seeing Respondent's troubles in the news. The OBA charged Respondent with violating Rules Rules 1.1 (competence), 1.7(b) (conflict of interest—sexual relations prohibited), 1.8(b) (conflict of interest—use of information to the disadvantage of the client), 2.1 (scope of advice), 8.4(a) (violation or attempted violations of the ORPC) and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and Rule 1.3 (acts that bring discredit on the legal profession) of the RGDP.

¶ 60 It appears from the evidence that Respondent essentially represented A.M. for free as she never paid him any fees. Respondent admitted to being irritated with A.M. for her failure to pay but nonetheless he successfully obtained a deferred sentence for her. The evidence submitted does not clearly and convincingly reflect that Respondent violated any of the alleged rules on this count.

### Count XIII: The Elliott Matter

#### A. Background

¶ 61 On February 13, 2006, Respondent was representing a client at a misdemeanor hearing docket for revocation of the client's suspended sentence on a prior domestic abuse charge. The client had failed to complete an AIP course, one of the terms of his probation, which resulted in his arrest. Respondent approached Assistant District Attorney Sandra Elliott (Elliott) to negotiate a deal for his client to complete the AIP program.

¶ 62 Respondent maintains that he presented Elliott with an order that simply stated his client would complete AIP, she signed it and he then presented it to the judge. Respondent testified that the judge informed him that he had used the wrong order form so he wouldn't sign it.

¶ 63 Respondent found a new form and presented it to Elliott for her signature. The new form was a "Rules and Conditions of Probation" form on which Respondent had crossed out the first eleven standard conditions of probation and checked the box to attend AIP. Elliott refused to sign the form presented to her as Respondent had stricken all of the probation terms, something she would not agree to do. Respondent claimed that Elliott told him she wouldn't sign it and for him to do whatever he wanted. Respon-

dent then signed Elliott's name to the document "by M.G." and gave the document to his client to present to the probation department. Elliott testified that she did not authorize Respondent to sign the form on her behalf.

## B. Analysis

¶ 64 In this count, Respondent continues his disregard for the rules of his profession. Respondent's repeated liberties with the signatures of other attorneys have apparently become routine practice. We agree with the PRT that the OBA clearly and convincingly proved Respondent's violations of Rules 8.4(a) (violation or attempted violations of the ORPC), and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) of the ORPC and Rules 1.3 (acts contrary to prescribed standards of conduct) of the RGDP.

¶ 65 While Respondent may have lawfully obtained Elliott's signature on the first, rejected order, Elliott expressly refused to sign the next order Respondent presented to her. Respondent had no authority to indicate Elliott's approval of the order and his decision to fraudulently sign on her behalf clearly constitutes an ethical violation.

## Count XIV: The Smith–Hathorn Grievance

### A. Background

¶ 66 On July 6, 2006, Pamela Jo Smith–Hathorn (Smith–Hathorn), on a referral from the NAACP, met with Respondent to discuss her case. Smith–Hathorn wanted Respondent to appeal a decision of the Tenth Circuit, United States Court of Appeals, to the United States Supreme Court. Respondent told her he would need a retainer of $1,500.00 and that he would charge $300.00 per hour. Respondent told her it would take $10,000.00 for him to ultimately file an appeal with the Supreme Court. Smith–Hathorn initially gave Respondent $3,000.00 and, a few days later, she gave him an additional $300.00 to cover filing fees.

¶ 67 On July 19, 2006, after conducting research and reviewing her files, Respondent wrote Smith–Hathorn a seven page letter setting forth the reasons he did not believe she had a legitimate chance for a successful appeal. Respondent also returned Smith–Hathorn's $300.00 filing fee and welcomed her to obtain another opinion.

¶ 68 Smith–Hathorn was unhappy with Respondent, wanted her $3,000.00 reimbursed and claimed that Respondent was hired to file an appeal, not review her case to determine whether an appeal would be successful.[18] Smith–Hathorn ultimately filed the appeal herself and was denied certiorari.

¶ 69 Respondent testified that he reviewed Smith–Hathorn's entire file which consisted of four volumes of transcripts and ten stacks of files. He testified that his review of the file and time spent on research far exceeded the $3000 Smith–Hathorn paid him. Smith–Hathorn acknowledged it would take a significant amount of time to review the record in her case. Respondent testified that following his review of the files and research of pertinent law, he believed Smith–Hathorn would be unsuccessful on appeal and so informed her of his belief.

### B. Analysis

¶ 70 The OBA charged Respondent with multiple violations on this count including violations of Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication with client), 1.5 (reasonable fees), 1.15 (safekeeping and accounting of client's funds), 8.4(a) (violation or attempted violations of the ORPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and Rule 1.3 (acts contrary to prescribed standards of conduct) of RGDP. We agree with the PRT that the evidence presented by the OBA failed to clearly and convincingly prove the alleged violations.

¶ 71 Respondent testified that he spent more than 10 hours reviewing and researching Smith–Hathorn's case, which would have

18. The contract between the parties stated that Respondent would review the file to determine if an appeal to the U.S. Supreme Court was advisa-

ble. Smith–Hathorn claims Respondent altered the terms of the contract after she signed a blank contract form.

placed her fee in excess of the initial $3,000.00 retainer she had paid. The OBA presented no evidence to dispute this testimony and we find no evidence that Respondent's fee was unreasonable.[19] Likewise, there was no misconduct in Respondent providing Smith–Hathorn with his opinion that, after researching the matter, her case would not be successful.[20]

## Count XV: The Lanzner Matter

### A. Background

¶ 72 Barry Lanzner ("Lanzner"), an Oklahoma City police officer, began meeting with Respondent in March 2004 in connection with Respondent's ticket quota case against the Oklahoma City Police Department (OCPD). Lanzner provided Respondent with information and documentation on the ticket quota case as well as discussed his own issues with the OCPD. Lanzner believed Respondent was going to add him as a plaintiff to the class action suit. Lanzner continued to provide documentation to Respondent and/or stop by Respondent's office for approximately two years.

¶ 73 Lanzner admits he never signed a contract with Respondent, never paid any fees to Respondent, nor discussed any contingency fee with Respondent. Respondent testified that he did not have a contract with Lanzner and that he was never a client. Respondent testified that Lanzner simply provided him information in the ticket quota case and that he viewed him as a potential witness.

### B. Analysis

¶ 74 The evidence on this count reflects no attorney-client relationship was ever established between Lanzner and Respondent. The parties never entered into a con-

tract or discussed fees. The fact that Lanzner provided Respondent with documentation and that Respondent met with Lanzner on multiple occasions is insufficient to establish an attorney-client relationship and cannot be the basis for the alleged rules violations. The OBA failed to provide clear and convincing evidence on this count.[21]

## ENHANCEMENT

¶ 75 This Court may consider prior discipline in determining the degree of discipline to be imposed for an attorney's current misconduct. RGDP, Rule 1.7. "A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." *See State ex rel. Oklahoma Bar Association v. Garrett,* 2005 OK 91, ¶ 9, 127 P.3d 600.

¶ 76 Unfortunately, Respondent is no stranger to the disciplinary process and the gravity of his misconduct has been significant. In 1987, Respondent was twice disciplined for misconduct. In one instance, Respondent received a public censure for misconduct stemming from his criminal convictions in state and federal courts for willful failure to file income tax returns. Respondent served six months in a federal penitentiary. In the second matter, Respondent received a one-year suspension from the practice of law for two separate counts of misconduct involving neglect, conflict of interest, and providing a false statement in a verified affidavit.

¶ 77 In December 1988, Respondent's prior one-year suspension was extended an additional two months for professional misconduct arising from three counts of neglect of clients' matters.

---

19. We agree with the PRT that if Smith–Hathorn has a dispute with Respondent regarding the fee she paid, such a claim is better suited for civil court and not this bar disciplinary proceeding. *See State ex rel. Oklahoma Bar Association v. Flaniken,* 2004 OK 6, ¶ 9, 85 P.3d 824.

20. In fact, Respondent could have continued with the case and charged Smith–Hathorn the full $10,000.00 he mentioned in their first meeting and produced the same result she reached on her own: denial of certiorari.

21. The asserted violations consisted of Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication with client), 1.16 (declining representation), 8.4(a) (violation or attempted violations of the ORPC), 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), and 8.4(d) (conduct that is prejudicial to the administration of justice) of the ORPC and Rule 1.3 (acts contrary to prescribed standards of conduct) of RGDP.

¶ 78 Finally, on or about July 18, 1995, this Court approved Respondent's application for resignation pending disciplinary proceedings and ordered his name stricken from the roll of attorneys.[22] Respondent was convicted on May 17, 1995 in the United States District Court for the Western District of Oklahoma of one count of making a false statement on a tax return, a felony. Respondent was sentenced to a one-year term of imprisonment, an upward-adjusted sentence by the court as it found that Respondent perjured himself during his trial testimony.[23]

## MITIGATION

¶ 79 The record is devoid of any evidence Respondent expressed remorse for his actions. In fact, Respondent vigorously denies the allegations in all fifteen counts against him and, in many of the counts, asserts as a defense that the grievant has a vendetta against him. As the record stands, there is nothing to consider in mitigation of Respondent's reprehensible misconduct.

## DISCIPLINE

¶ 80 One of the primary purposes of disciplinary proceedings is not to punish the attorney but to remove from practice those attorneys whose misconduct has proved them to be unfit with the responsibilities of the profession so that the public may be protected from further wrongdoing. *See State ex rel. Oklahoma Bar Ass'n v. Beasley,* 2006 OK 49, ¶ 34, 142 P.3d 410.[24] Preservation of the public's confidence in the legal system as well as in the judiciary that licenses its practitioners is essential to its success. Such confidence depends on our willingness to inflict severe discipline in appropriate cases. *State ex rel. Oklahoma Bar Ass'n v. Brown,* 1993 OK 39, ¶ 13, 863 P.2d 1108, 1111.

¶ 81 The gravity of the offenses committed by Respondent, and clearly proven by the OBA, mandates our highest discipline. Respondent's repeated disregard for the rules of his profession warrants severe action to redress the egregious wrongs committed. Respondent's misconduct provides a classic example of why the disciplinary system exists for the protection of the public.

¶ 82 In *State ex rel. Oklahoma Bar Ass'n v. Colston,* 1989 OK 74, 777 P.2d 920, this Court found that disbarment was warranted where an attorney engaged in a five-year pattern of deceptive practices. Those practices consisted of "the forging of adverse parties' appearance, fraud in obtaining public officials' signatures, neglect of clients' legal matters and false representations about the status of cases." *Colston,* 1989 OK 74, ¶ 23, 777 P.2d at 926. Here, the repugnancy of Respondent's violations surpass even those in *Colston* and cannot be tolerated.

¶ 83 "Honesty and integrity are the cornerstones of the legal profession. Nothing reflects more negatively upon the profession than deceit." *State ex rel. Oklahoma Bar Ass'n v. Pacenza,* 2006 OK 23, ¶ 33, 136 P.3d 616. In *State ex rel. Oklahoma Bar Ass'n v. Thomas,* 1995 OK 145, 911 P.2d 907 we found that:

> [f]raud and misrepresentation by an attorney toward his client are serious forms of misconduct. Likewise, the forging of legal documents is a serious breach of legal ethics which constitutes illegal conduct involving moral turpitude and justifies imposition of the most severe discipline. Such misconduct, coupled with neglect of client matter(s) and a record of previous discipline has resulted in disbarment.

*Thomas,* 1995 OK 145, ¶ 15, 911 P.2d at 913 (citations omitted). Moreover, the exploitation of clients for the personal gratification of the attorney will not be tolerated by this

---

**22.** Respondent's resignation was based upon two pending grievances. The first grievance was a four count complaint alleging violations of Rules 1.3 (diligence), 1.5 (an attorney must charge reasonable fees) and 8.4 (misconduct) of the ORPC and Rule 5.2 (general investigation procedure, failure to respond to inquiry is grounds for discipline) of the RGDP. The second grievance involved the federal tax fraud conviction.

**23.** *United States v. Gassaway,* Case No. CR–95–20–A, Findings at 4 (W.D.Okla. Aug. 29, 1995).

**24.** "The purposes of discipline are the protection of the public, the preservation of the integrity of the bar and the deterrence of similar misconduct." *State ex rel. Oklahoma Bar Ass'n v. Beasley,* 2006 OK 49, ¶ 34, 142 P.3d 410

Court. *State ex rel. Oklahoma Bar Ass'n v. Sopher*, 1993 OK 55, ¶ 14, 852 P.2d 707, 711.

¶ 84 Respondent's history of misconduct and untruthfulness with the courts, his clients, and his opponents has been conclusively established. Respondent was previously reinstated under our procedure which requires a showing of a proper understanding of professional standards and a willingness to conform to such standards. Instead of upholding those standards, Respondent has engaged in conduct which clearly demonstrates an utter disregard of professionalism. One of Respondent's current violations standing alone would be sufficient to command disbarment; all six taken together merely serve to reinforce the decision.

¶ 85 Respondent's actions over the course of his legal career have brought disrepute and extreme embarrassment to his profession. The seriousness of Respondent's latest violations and his complete lack of remorse and refusal to acknowledge any wrongdoing can only warrant immediate and permanent disbarment.

## COSTS

¶ 86 Pursuant to Rule 6.16 of the RGDP, where violations are proven in disciplinary proceedings, the costs shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court. We have previously held that the costs assessed against an attorney by the OBA may be reduced in part where the OBA fails to prevail on all of the counts charged. *See State ex rel. Oklahoma Bar Ass'n. v. Israel*, 2001 OK 42, ¶ 32, 25 P.3d 909 (where attorney prevailed on two of three counts in a disciplinary case, costs to be paid by him were reduced to one third of the amount requested); *State ex rel. Oklahoma Bar Ass'n v. Funk*, 2005 OK 26, ¶ 78, 114 P.3d 427 (same).

¶ 87 Here, the OBA charged Respondent with fifteen (15) counts of misconduct and seeks costs in the amount of $17,587.92. We find that the OBA clearly and convincingly presented proof in six (6) of the fifteen (15) counts alleged against Respondent. While we agree that the assessed costs against

Respondent should be reduced, we also recognize that Respondent filed several motions before the PRT, as well as this Court, which were unsuccessful and increased the costs of these proceedings. In addition, there was a disproportionate amount of evidence and testimony presented regarding Count VI, a count which we found Respondent violated. Accordingly, costs to be assessed against Respondent are reduced to $10,000.00, all of which shall be paid within ninety days of the effective date of this opinion.

## CONCLUSION

¶ 88 Upon our *de novo* review, we conclude there is clear and convincing proof that Respondent violated the ORPC and the RGDP. We order that John Michael Gassaway be disbarred, that his name be stricken from the role of attorneys, and that he bear the costs of this proceeding in the amount of $10,000.00.

**RESPONDENT DISBARRED; COSTS IMPOSED.**

ALL JUSTICES CONCUR.